# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 4278 | **DATE** | 3/24/2003 |
| **CASE TITLE** | Kemper/Prime Industrial Partners, vs. Montgomery Watson Americas | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant's motion for summary judgment is granted [190-1] because we find that no duty existed between defendant and the Enterprise Centers. Therefore, the Enterprise Centers' claims against defendant are dismissed with prejudice. Kemper/Prime's motion for summary judgment as to Montgomery Watson's indemnification provision is denied {192-1}. This case is 1997 case and the Court has no addressed two rounds of summary judgment. Filing of the pretrial order in open court set for 4/17/03 at 2:00p.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

MAR 26 2003
date docketed

docketing deputy initials

date mailed notice

Document Number

227

TBK — courtroom deputy's initials

U.S. DISTRICT COURT

Date/time received in central Clerk's Office

mailing deputy initials

DOCKETED

MAR 2 6 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KEMPER/PRIME INDUSTRIAL PARTNERS, )
ENTERPRISE CENTER VII, L.P., )
ENTERPRISE CENTER VIII, L.P., )
ENTERPRISE CENTER IX, L.P., )
ENTERPRISE CENTER X, L.P., )
)
    Plaintiffs, )
)
    v. )    **Judge Ronald A. Guzmàn**
)
MONTGOMERY WATSON AMERICAS, INC.,)    97 C 4278
)
    Defendant, )
)
    v. )
)
THE PRIME GROUP INC., )
)
    Third-Party Defendant. )

### MEMORANDUM OPINION AND ORDER

Plaintiffs Kemper/Prime Industrial Partners, Enterprise Center VII, L.P.,

Enterprise Center VIII, L.P., Enterprise Center IX, L.P., and Enterprise Center X, L.P.

have sued defendant Montgomery Watson Americas, Inc. for negligent

misrepresentation. Defendant Montgomery Watson Americas, Inc. subsequently filed a

third-party claim against The Prime Group, Inc. seeking indemnification from a form

agreement that was executed in connection with a former project.

Before this court is defendant Montgomery Watson Americas' Inc. motion for

summary judgment against the four Enterprise Centers pursuant to FED R. CIV. P.

("Rule") 56. This motion seeks a finding, as matter of law, that Montgomery Watson

Americas' Inc. ("Montgomery Watson") owed no duty to the Four Enterprise Centers

under the limited reach of Illinois' law of negligent misrepresentation. Also pending is third-party defendant the Prime Group Inc's. motion for summary judgment against Montgomery Watson pursuant to Rule 56.

For the reasons set forth below Montgomery Watson's motion for summary judgment is granted as to no duty owed to the Enterprise Centers. The Prime Group's motion for summary judgment based on alleged unenforceability of the indemnification provision is denied.

## FACTS

In June 1990, Plaintiff Kemper Prime Industrial Partners purchased a 120 acre parcel of industrial property located at 13535 S. Torrence Ave. in Chicago, Illinois. In anticipation of purchasing the site, from U.S. MetalSource Corp. the Prime Group, Inc.'s managing general partner, James Martell, retained Warzyn Engineering, Inc. to perform an environmental assessment of the property in order to determine if potential environment concerns or liabilities existed at the property. Warzyn is the predecessor to the defendant in this case, Montgomery Watson. It is undisputed that Montgomery Watson never owned the property or occupied the property nor did it engage in any operation of any kind.

On February 28, 1990, Prime Group and Warzyn executed Agreement No. 60848 or Work Order No. One. Work Order No. One related exclusively to services to be performed by Warzyn at the property. Work Order No. One expressly provided "the Services shall be performed subject to and upon the termed conditions set forth in the Professional Services Agreement (the "Agreement") dated December 12, 1989, by and between Warzyn and Client [the Prime Group], which Agreement is hereby amended to

2

incorporate this Work Order. James Martell, Senior Vice-President for the Prime Group admitted he saw and forwarded the December 12, 1989 Professional Services Agreement to Prime Group's legal department, which approved the Professional Service Agreement before Martell signed it. Mr. Martell also received authorization from Prime Group's legal department to sign Work Order One incorporating the December 12, 1989 Professional Agreement.

The Professional Service Agreement contained an Indemnification provision in paragraph 9 which provided the following:

> except for claims covered under the policies of insurance and policy limits identified in paragraph 7, the Client shall be solely responsible to third parties for damages arising as a result of Warzyn's performance or nonperformance of any Services. To the maximum extent permitted by law, the Client shall indemnify, defendant and hold harmless Warzyn from all costs arising out of or connected with third party claims, other than claims covered under the policies of insurance and policy limits identified in Paragraph 7.

Warzyn then conducted a four month environmental assessment of the Property and was paid over $100,000 for its services.[1] (Third-Party Def.'s LR 56.1(a)(3) ¶ 3.) This investigation was conducted in two phases and consisted of a site visit, a historical records search, a review of previous reports concerning the property, and an investigation of existing state and federal background information pertaining to the property and testing of the soil and other duties. Warzyn also performed a subsurface investigation which included soil boring, installation of monitoring wells, analyses of required decontamination procedures, water level measurements, ground water sampling, PCB

---

[1] MWA disputes this assertion "insofar as Prime Group suggests there was an investigation continually ongoing for four months." (Def.'s LR 56.1(a)(3) ¶ 3.)

wipe sampling procedures and other field issues. A limited second round of boreholes was approved by the Prime Group only for the east side of the property. Warzyn had its proposed scope of work cut "significantly" by the Prime Group, and as a result Warzyn concluded in 1990 that in numerous places there were still undefined areas out on the grounds. D. Wieman Tr. 68:10-69:12 and 88:12-91:15. It is undisputed that Warzyn as part of its environmental assessment requested Sanborn Fire Maps but were told they were unavailable. It is also undisputed that sometime after Warzyn performed its assessment it became apparent that Sanborn Maps for the property were available for the years 1897, 1913, 1947, 1950, 1976, and 1987. The Sanborn Maps for 1947 and 1950 revealed the presence of twenty-six (26) underground storage tanks (adjacent to building A) but the later two maps did not show the underground tanks. Mr. Garske of Carlson Financial testified that "there were no underground storage tanks at the property when Warzyn performed its 1990 assessment; since the time Warzyn was on the property in 1990 there have been no UST's removed , and there are no UST's at the site today. (Garske Tr. 75:11-76:11)

The investigation was completed in June of 1990. Warzyn published two reports entitled "Environmental Assessment" and "Subsurface Investigation" The 1990 report identified environmental contamination all across the property and additional sampling and investigation would be required to determine the full extent of the contamination. (D. Wieman Tr. 68:10-69:12 and 88:12-91:15).These two final reports were finalizations of earlier draft reports provided to the Prime Group.

Plaintiff, Kemper/Prime Industrial Partners ("Kemper/Prime") then formed an Illinois general partnership on or about June 22, 1990, and purchased the Property and its

4

industrial buildings five days later. (Def.'s LR 56.1(a)(3) ¶¶ 7-8.) U.S. MetalSource agreed to indemnify the Prime Group for certain environmental conditions on the property, ie. asbestos removal and environmental contamination (See ¶¶ 6,7,8 & 9 of the Improved Real Estate Purchase Agreement, Exhibit 1 to Kemper Prime's L.R. 56.1(b)(3)(A) Statement). U.S. MetalSource then filed bankruptcy approximately one year later.

On or about June 4, 1992, Enterprise Center VII, L.P., Enterprise Center VIII, L.P., Enterprise Center IX, L.P., and Enterprise Center X, L.P. ("Enterprise Centers") were formed. (*Id.* ¶ 10.) After formation of the of the four enterprise centers, a new investigation of the property was conducted for environmental assessment purposes by Dunn Corporation ("Dunn") on or about February 3, 1993.

As part of Dunn's investigation, it is undisputed that Dunn Corporation referenced Warzyn's environmental report noting inconsistent conditions set forth in Warzyn environmental assessment and raised questions as to other points in Warzyn's assessment of the site. Dunn discovered additional widespread contamination on the Property which allegedly existed prior to Kemper/Prime's 1990 purchase of the Property. (Third-Party Def.'s LR 56.1(a)(3) ¶ 13.)

On or about June 25, 1993 Kemper/Prime Industrial Partners sold Site Lots 2 and 16 to Enterprise Centers VII L.P. for $6,901,562. On or about June 25, 1993, Kemper/Prime Industrial partners sold Site Lots 7,8,9, 10, and 11 to Enterprise Center VIII, L.P. for $5,647,180. Thereafter, during 1995-1997, Kemper/Prime Industrial Partners sold to other persons not in this lawsuit Lots 18, 19 and 20 located at the north end of the Site. On or about June 25, 1993, Kemper/prime Industrial Partners sold Site

5

Lots 13, 14 and 15 to enterprise Center IX, L.P. for $4,098,731. On or about June 25, 1993, Kemper/Prime Industrial partners sold Site Lots 6 and 12 to Enterprise Center X, for $3,518, 166. Kemper/Prime Industrial Partners retains ownership of only Lots 1,3,4,5,and 17 at the site. These transfers were not considered to be between related parties (Montgomery Watson Group Exhibits 9-12).

James Martell, senior vice-president of Kemper/Prime and the four Enterprise Centers, acted on behalf of the seller and purchaser in this transaction. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 7-8.) It is undisputed, however, that Warzyn was never informed of any use of its reports after the 1990 assessment. (Def.'s LR 56.1(a)(3) ¶ 22.)

Kemper/Prime claims that this contamination existed at the time Warzyn conducted its examination and that Warzyn failed to identify twenty-six underground storage tanks ("UST") which existed on the property adjacent to Building A.[2] (*Id.* ¶ 8.) Warzyn disputes the existence of the twenty-six underground storage tanks claiming that while they may have been on the property in 1950 and 1957 (as indicated in the Sanborn Fire Maps) (Def.'s LR 56.1(b)(3)(B) ¶ 8.) they did not exist in 1990 when they conducted their environmental assessment in 1990.

In 1996 Carlson Financial became involved at the property. The Prime Group has paid Carlson about $1,000,000 to further investigate environmental conditions on the property. Sometime in 1996 Enterprise Center VII L.P. sued Illinois Tool (Signode) for

---

[2] Warzyn denies this allegation as it fails to comply with the requirements of LR 56.1 because Prime Group failed to cite any "references to the affidavits, parts of the record, and other supporting materials relied upon." (Def.s' LR 56.1(a)(3) ¶ 8); LR 56.1.

lead contamination to the property adjacent to building R.. This case is currently pending in the U.S. D.Ct. N.D. Il. before Judge Anderson.

On June 13, 1997, Kemper/Prime sued the defendant, Montgomery Watson for negligent misrepresentation. (Third-Party Def.'s LR 56.1(a)(3) ¶ 16.) Kemper Prime alleges that Montgomery Watson in conducting a 1990 environmental assessment of the property, negligently misrepresented the unavailability of Sanborn Fire Maps purportedly showing that 26 underground storage tanks were located at the property. (Amended Compl. ¶ 24). Plaintiffs further argue that Montgomery Watson failed to properly analyze the soil samples taken at the property. (Amended Compl. at ¶ 25). The Prime Group admits that there have been releases of lead at the property since Warzyn completed its assessment in June 1990. (Exhibit F-2) Montgomery Watson has moved for summary judgment asserting that they owed no duty of care to Kemper/Prime and that Kemper/Prime was barred from bringing suit based on a limitations period set forth in a standard form agreement. (*Id.* ¶ 17.) On September 30, 1998, then-District Court Judge Ann C. Williams denied Montgomery Watson's motion for summary judgment. (*Id.* ¶ 18.) On July 14, 1999, Kemper/Prime amended its complaint to add the four Enterprise Centers as co-plaintiffs. (*Id.* ¶ 20.) On November 3, 1999, Montgomery Watson filed a third-party claim against Prime Group asserting that Prime Group is liable to Montgomery Watson pursuant to the indemnification provision contained in the standard form agreement. (*Id.*)

## DISCUSSION

A motion for summary judgment must be granted if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists when, viewing the record and drawing all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party makes a showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When deciding a motion for summary judgment, all reasonable factual inferences must be viewed in favor of the non-moving party. *Holland v. Jefferson Nat'l. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

## I. Montgomery Watson's Motion for Summary Judgment

Defendant Montgomery Watson argues that summary judgment should be granted against the subsequently formed limited partnerships, the Enterprise Centers VII, VIII, IX, and X because a negligent misrepresentation claim cannot exist as to Montgomery Watson because Montgomery Watson owes no duty to the Enterprise Centers. Third-party defendant, Prime Group, disputes Montgomery Watson's argument claiming that a duty is owed to the Enterprise Centers. Third-party defendant, the Prime Group, argues that summary judgment should be granted against Montgomery Watson because the indemnification provision in Montgomery Watson agreement is inapplicable or, alternatively, unenforceable. The parties arguments will be addressed in turn.

As a general rule, under the Illinois tort of negligence, damages are not

recoverable when a plaintiff suffers from purely economic loss. *Moorman Mfg. Co. v. Nat'l. Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982). In *Moorman*, however, the Illinois Supreme Court recognized that economic loss is recoverable for negligent misrepresentation by a defendant who is in the business of supplying information for the guidance of others in business transactions. *Id; Prime Leasing, Inc. v. Kendig*, No. 1-00-2684, 2002 WL 1401911 at *7 (Ill. App. Ct. June 28, 2002).

To state a cause of action for negligent misrepresentation, the plaintiff must show that: (1) the defendant made a false statement of material fact; (2) the defendant was careless or negligent in ascertaining the truth of the statement; (3) the defendant intended to induce the plaintiff to act; (4) the plaintiff acted in reliance on the statement; (5) the plaintiff suffered damages as a result of this reliance; and (6) the defendant owed a duty to the plaintiff to communicate accurate information. *Bd. of Educ. v. A, C and S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989); *Kemper/Prime Indus. Partners v. Montgomery Watson Americas, Inc.*, No. 97 C 4278, 1998 WL 704049 at *7 (N.D. Ill. Sept. 30, 1998). The tort of negligent misrepresentation has been applied where client contemplating purchase of building hired a company to conduct an environmental site assessment and prepare a written report. *See Tribune Co. v. Geraghty & Miller, Inc.*, 97 C 1889, 1997 WL 438836 (N.D. Ill., July 15, 1997)(Judge Conlon).

For purposes of this summary judgment motion, Montgomery Watson admits that it is in the business of supplying information for the guidance of others in their business transactions. (Def.'s Mem. Supp. Summ. J. at 8.) At issue in this case is whether Montgomery Watson owed a duty to the Enterprise Centers to communicate accurate

9

information.[3]

Montgomery Watson argues that it owed no duty to the four Enterprise Centers because: (1) the Enterprise Centers did not exist at the time Montgomery Watson submitted its reports, (2) Montgomery Watson was unaware of Enterprise Centers' formation, and (3) Montgomery Watson was unaware of any future use of its reports. To support this argument, Montgomery Watson relies on *General Electric v. Equifax Services, Inc.* as a comparable case. *Equifax,* 797 F.Supp. 1432 (N.D. Ill. 1992). In particular, Montgomery Watson states that defendant Equifax owed no duty to co-plaintiff GECCAF because GECCAF did not exist at the time Equifax submitted its report to plaintiff GECC. (Def.'s Mem. Supp. Summ. J. at 10.) A close reading of *Equifax,* reveals that the court did not rely solely on the fact that GECCAF did not exist at the time Equifax submitted its report. Instead, the court added that GECCAF also failed to show in what manner GECCAF relied upon the report once it came into existence. *Equifax,* 797 F.Supp. at 1449. Additionally, *Equifax* stated that, "[w]hat [co-plaintiff] GECAFF has not shown, and what requires judgment in Equifax's favor[,] . . . is any indication that GECC would pass on the information contained in the . . . report to GECAFF." *Equifax,* 797 F.Supp at 1449.

In this case, Enterprise Centers allege that James Martell acted on behalf of both Kemper/Prime and Enterprise Centers in the property transaction where the limited partnerships purchased their respective parcels of property. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 7-8.) Viewing the facts in the light most favorable to the non-moving party, it can be

---

[3] The defendant raises the issue that MWA did not induce the co-plaintiff to act; however, the defendant does not support this issue with law or argument.

inferred that James Martell, as senior vice-president of the Prime Group and Kemper/Prime would use the information contained in Montgomery Watson's environmental assessment as well as rely on this information when making a decision on whether to purchase the property in question. This is consistent with Judge William's finding on the issue. However, the question remains whether Montgomery Watson owed a duty to the Enterprise Centers, a subsequent purchaser to communicate accurate information.

The existence of a duty is a question of law, and the answer depends on whether there is such a relationship between the defendant and the plaintiff that the defendant has an obligation of reasonable conduct for the benefit of the plaintiff. *Gallagher Corp. v. Russ,* 721 N.E. 2d 605, 610 (Ill. App. Ct. 1999) (citing *Pelham v. Griesheimer,* 440 N.E. 2d 96 (Ill. 1982)). In *Rozny v. Marnul,* the seminal case in Illinois establishing negligent misrepresentation the Illinois Supreme Court discussed the reach of such a duty *Rozny v. Marnul,* 250 N.E.2d 656, 662-63 (Ill. 1969). In *Rozny,* the defendant surveyor negligently represented a "plat of survey" for the builder Nash, and the plaintiffs, who subsequently purchased the property from Nash, brought suit based on the defendant surveyor's negligent misrepresentation. *Rozny,* 250 N.E.2d at 658. Even though the defendant was unaware of the plaintiff's identity, the Illinois Supreme Court held that the defendant owed a duty to the plaintiffs because reliance on his information by the plaintiffs was foreseeable. *Id.* at 663.

Therefore, this Court analyzes this case by the requirements set forth in *Rozny* and subsequent cases interpreting Illinois negligent misrepresentation. The Illinois Supreme Court outlined several factors to consider when examining the existence of a duty to

11

convey accurate information.[4] *Rozny*, 250 N.E.2d at 662-63. Specifically, a defendant owes a duty to communicate accurate information to a plaintiff if: (1) the use of the information was foreseeable, (2) the defendant knew the information would be used and relied upon by persons other than those in privity with him, and (3) the defendant's potential liability is restricted to a comparatively small group. *Kemper/Prime Indus. Partners*, 1998 WL 704049 at *7; *Fremont Fin. Corp. v. IPC/LEVLY, Inc.*, 994 F.Supp. 988, 992 (N.D. Ill 1998).

It is undisputed that Judge Williams previously decided that Kemper/Prime raised a genuine issue of material fact as to whether it was foreseeable that Kemper/Prime would use and rely upon the information contained in Montgomery Watson's assessment reports when purchasing the property. *Kemper/Prime Indus. Partners*, 1998 WL 704049 at *8-9. However, this same conclusion cannot be reached as to the Enterprise Centers-a subsequent purchaser. Our conclusion is based upon the following undisputed factors. It is undisputed that the Enterprise Centers acquired title to their respective parcels of property after two to three years had lapsed since Montgomery Watson performed its environmental assessment. While it is undisputed that the Enterprise Centers would look to Montgomery Watson's environmental assessment from a historical perspective it

---

[4] The factors include: "(1) the express, unrestricted and wholly voluntary 'absolute guarantee for accuracy' appearing on the fact of the inaccurate plat; (2) defendant's knowledge that this plat would be used and relied on by others than the person ordering it, including plaintiffs; (3) the fact that potential liability in this case is restricted to a comparatively small group, and that, ordinarily, only one member of that group will suffer loss; (4) the absence of proof that copies of the corrected plat were delivered to anyone; (5) the undesirability of requiring an innocent reliant party to carry the burden of a surveyor's professional mistakes; (6) that recovery here by a reliant user whose ultimate use was foreseeable will promote cautionary techniques among surveyors." *Rozny*, 259 N.E.2d at 663.

12

is also undisputed the Enterprise Centers had their own environmental assessment performed. This is not surprising as the land being sold to the Enterprise Centers was in a different condition by virtue of the fact that three years had passed and the land had been used by various tenants. Thus, while <u>use</u> of the information was foreseeable <u>reliance</u> on Warzyn's three year old assessment was not. While not identical, it is not unlike the transfer of residential real property in that each time a house is sold or transferred an independent type of inspection takes place which analyses the property from a different inspector's standpoint or from a latter perspective in the life of an aging home, building or parcel of property.

Enterprise Centers asserts that it is consistent with industry practice for environmental assessment consultants to use prior environmental reports to develop their own property assessment. (Pl.'s LR 56.1(b)(3)(B) ¶ 17.) For example, Enterprise Centers allege that Warzyn reviewed and relied on existing environmental reports when conducting its investigation. (*Id.*) Furthermore, Enterprise Centers assert that Montgomery Watson knew their reports would be relied upon by multiple parties because Warzyn's senior manager, Sandra Sroonian, testified in deposition that Warzyn made "it a practice to send reports to anyone who the client would ask to receive a report." (*Id.* at ¶ 15.) But the fact that prior environmental reports and/or historic records maintained by federal and state agencies are used by a prospective purchasers does not as a matter law establish foreseeable reliance. To be sure, prior assessments can be used to enlighten purchasers as to history of the property or what the property was like when the prior purchase took place, but it does not automatically create a duty in a party to an earlier sale.

13

As *Rozny* stated:

> The situation is not one fraught with such an overwhelming potential
> liability as to dictate a contrary result, for the class of persons who might
> foreseeable use this plat is rather narrowly limited, if not exclusively so, to
> those who deal with the surveyed property as purchasers or lenders.
> Injury will ordinarily occur only once and to the one person then owning
> the lot." *Rozny*, 250 N.E.2d at 662.

The fact that Kemper/Prime has a relationship with the Enterprise Centers Limited
Partnerships does not change this result. It is undisputed that legally the Enterprise
Centers are new owners and as part of this subsequent sale an environmental assessment
was in fact performed by Dunn which the Enterprise Centers had a right to rely on and
did in fact rely on. Kemper/Prime's allegations that Montgomery Watson failed to
perform the environmental assessment accurately or failed to discuss the fact that 26
underground storage tanks had been on the property during the later 1940 and early
1950's does not change this outcome. If there was remaining contamination after the
removal of these tanks this contamination should have and was in fact discussed by the
Enterprise Centers environmental consultant. A subsequent purchaser can protect itself
by inspecting the property before purchasing (to determine whether to proceed), express
contractual provisions, and reflection of condition in the purchase price. This case is
certainly not one which can be construed as one of an innocent landowner because all the
parties involved in this litigation were well aware of the contamination. In fact, Kemper
Prime clearly manifested its intent to transfer all environmental liability to U.S.
MetalSource in the initial purchase. We find there can be no justifiable reliance on the
environmental assessment performed by Montgomery Watson. Montgomery Watson
motion for summary judgment against Enterprise Center VII, L.P. Enterprise Center VIII,

14

L.P., Enterprise Center IX, L.P., and Enterprise Center X, L.P is hereby granted.

## II. The Prime Group's Inc. Motion for Summary Judgment

Montgomery Watson has filed a third-party claim against the Prime Group alleging that Prime Group indemnified Montgomery Watson pursuant to a Professional Services Agreement. Prime Group asserts that summary judgment should be granted in its favor for three reasons: (1) the Professional Service Agreement containing the indemnification provision does not apply to the services in this case, (2) if the agreement does apply, the indemnity provision is unenforceable because the provision does not clearly and explicitly evidence the intent to indemnify, and (3) the indemnity provision is unenforceable pursuant to the Illinois Construction Contract Indemnification for Negligence Act.

To determine whether the indemnification provision contained in the Professional Services Agreement can be applied, it is necessary to address whether Work Order number 60848 is a complete contract. Illinois applies the "four corners" rule when interpreting a contract. *Bourke v. Dun & Bradstreet*, 159 F.3d 1032, 1036 (7th Cir. 1998). In doing so, the court must give effect to the intention of the parties involved. *In re Doyle*, 581 N.E.2d 669, 676 (Ill. 1991). When the contract is unambiguous, the court looks at the contract itself as the only criterion for the intention of the parties. *Shelton v. Andrew*, 478 N.E.2d 311, 314 (Ill. 1985). However, it is necessary to give the contract a fair and reasonable interpretation based on a consideration of all the language and provisions. *Id.* Thus, courts are not confined to a strict interpretation of the language when that construction favors the intention of neither of the parities. *Id.* Additionally,

"when the language used is susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression [citation]," a contract is considered ambiguous. *Wald v. Chicago Shippers Ass'n.*, 529 N.E.2d 1138, 1145 (Ill. App. Ct. 1988). The inquiry of whether a contract is ambiguous is a question of law for the court. *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 767 N.E.2d 945, 949 (Ill. App. Ct. 2002).

In this case, Work Order number 60848 is not a complete contract under the Illinois "four corners" rule. The provision in dispute states, "[t]he services shall be performed subject to and upon the terms and conditions set forth in the Professional Services Agreement (the "Agreement") dated <u>December 12, 1989,</u> by and between *WARZYN* and *CLIENT*, which Agreement is amended to incorporate this Work Order." Although the actual language of the sentence is unambiguous, the contract, Work Order number 60848, is unclear about what terms and conditions are incorporated through the Professional Services Agreement. Therefore, extrinsic evidence, i.e. the Professional Services Agreement, may be considered by the trier of fact in determining the parties' intent.

Since the Professional Services Agreement may be used to clarify the meaning of the Work Order, then the court must next determine whether the indemnification provision contained in the Professional Services Agreement is enforceable. "It is well settled law that indemnity contracts are strictly construed." *McNiff v. Millard Maint. Serv. Co.*, 715 N.E.2d 247, 249 (Ill. App. Ct. 1999). "[A]n indemnity provision will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract . . . or such intention is

16

expressed in unequivocal terms." *Westinghouse Elec. Elevator Co. v. La Salle Monroe Bldg. Corp.*, 70 N.E.2d 604, 607 (Ill. 1946). A specific reference to "negligence" is not required to make an indemnity provision enforceable. *Chi. Hous. Auth. v. Fed. Sec., Inc.*, 161 F.3d 485, 487 (7th Cir. 1998); *Berwind Corp. v. Litton Indus. Inc.*, 532 F.2d 1, 4 (7th Cir. 1976). Furthermore, the Illinois Supreme court has held:

> that the contractual provisions involved (in the cases) are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish, or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions. *Tatar v. Faxon Constr. Co.*, 294 N.E.2d 272, 273-74 (Ill. 1973); *Berwind Corp.*, 532 F.2d at 4-5.

Much like general contract interpretation, an indemnity provision will be enforceable when the language used in the clause is unambiguous, explicit, and clear. *Freislinger v. Emro Propane, Co.*, 99 F.3d 1412, 1420 (7th Cir. 1996). If the indemnity provision is not ambiguous, it is the court's duty to enforce it. *Chi. Hous. Auth.*, 161 F.3d at 487.

In this case, the indemnity provision contained in the Professional Services Agreement is enforceable. The provisions in dispute state:

> [t]he CLIENT shall be solely responsible to third parties for damages arising as a result of WARZYN's performance or nonperformance of any Services. To the maximum extend permitted by law, the CLIENT shall indemnify, defendant and hold harmless WARZYN from all costs arising out of or connected with third party claims. (Def.'s Exhibit B, Professional Services Agreement, ¶ 9 CLIENT Indemnification of WARZYN.)

> To the extent that CLIENT expects WARZYN to rely solely upon existing information . . . the CLIENT agrees to waive any claim against WARZYN from and against any and all claims or liability for injury or loss allegedly arising from errors, omissions or inaccuracies in existing information provided to WARZYN by CLIENT or others. (*Id.* at ¶ 10b Information Provided by CLIENT to others.)

17

A fair and reasonable interpretation of this provision demonstrates that these indemnification clauses are unambiguous and clear. The language used explicitly indemnifies defendant "for damages arising as a result of [Montgomery Watson's] *performance* or nonperformance of any Services." (Def.'s Exhibit B, Professional Services Agreement) (emphasis added). In this case, the service for which Prime Group contracted with Montgomery Watson was the performance of the environmental assessment of the Property. It is undisputed that Montgomery Watson performed the environmental assessment and supplied Prime Group with its reports. (Third-Party Def.'s LR 56.1(a)(3) ¶¶ 3-4.) Therefore, any damages arising out of the performance of the environmental assessment are covered by the indemnification provision. Consequently, any damages arising out of the alleged negligent misrepresentation of the Property in Montgomery Watson's assessment are covered by the indemnification provision. Although the word "negligence" does not appear in this provision, use of the word "negligence" is unnecessary to indemnify a defendant from one's own negligence if the indemnification provision is clear and explicit.

Although Prime Group properly argues that the 10b clause of the Professional Services Agreement indemnifies the defendant "from claims due to errors in information given to it" and "not from claims due to Defendant's performance or conduct in interpreting such information," the indemnity provision in clause 9, nevertheless, would cover "claims due to Defendant's performance or conduct in interpreting such information." (Third-party def.'s Memo. Supp. Motion Summ. J. at 10.) Therefore, the indemnification provisions in the Professional Services Agreement are unambiguous and explicit, and, thus, enforceable. Prime Group certainly could have negotiated his

18

provision out of the contract.

Next, Prime Group argues that the indemnity provision violates the Illinois Construction Contract Indemnification for Negligence Act ("Construction Indemnity Act"). This Court disagrees. The Construction Indemnity Act expresses the legislature's policy of motivating contractors to take all necessary precautions for safety of construction workers and the general public. *N. River Ins. Co. v. Jones*, 655 N.E.2d 987, 991 (Ill. App. Ct. 1995). Furthermore, the intended purpose of the Construction Indemnity Act is to "ensure a continuing motivation for persons responsible for construction activities to take accident prevention measures and provide safe working conditions." *Davis v. Commonwealth Edison Co.*, 336 N.E.2d 881, 884 (Ill. 1975); *see also W.E. O'Neil Const. Co. v. Gen. Gas. Co. of Ill.*, 748 N.E.2d 667 (Ill. App. Ct. 2001).

In this case, the plaintiff argues that because the defendant constructed a well and a well is a structure, the contract falls within the scope of the Construction Indemnity Act. Albeit a well is a structure and construction of a well occurred, the contract in this case is not the type of contract contemplated by this legislation. The purpose of the Construction Indemnity Act is to prevent injuries resulting from negligence while conducting construction, not to prevent negligent misrepresentation of information gained during and by way of construction. Therefore, the indemnification provision in the Professional Services Act is not barred by the Construction Indemnity Act.

## CONCLUSION

For the foregoing reasons, Montgomery Watson's motion for summary judgment is granted [#190-1] because we find that no duty existed between Montgomery Watson

and the Enterprise Centers. Therefore, the Enterprise Centers' claims against
Montgomery Watson are dismissed with prejudice. Kemper/Prime's motion for summary
judgment as to Montgomery Watson's indemnification provision is denied [#192-1]. This
case is 1997 case and the Court has now addressed two rounds of summary judgment.
Filing of the pretrial order in open court is set for April 17, at 2:00 p.m.

SO ORDERED                    ENTERED:  3/24/03

                              HON. RONALD A. GUZMÁN
                              United States Judge